EILEEN M. DECKER
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
ELLYN MARCUS LINDSAY (Cal. Bar No. 116847)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2041
     Facsimile: (213) 894-6269
     E-mail:   ellyn.lindsay@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>                v.<br><br>APRIL FRANCIS MUIR,<br><br>          Defendant. | No. CR 07-1402-SJO<br><br>GOVERNMENT'S POSITION RE:<br>SENTENCING FACTORS AND RESPONSE TO<br>DEFENDANT'S SENTENCING MEMO<br><br>Date:  July 27, 2015<br>Time:  9:00 a.m.<br>Place: Courtroom of the<br>       Honorable S. James Otero |

     Plaintiff United States of America, by and through its counsel

of record, the United States Attorney's Office for the Central

District of California, hereby submits its Position Re: Sentencing

Factors and Response to Defendant's Sentencing Memo.  This filing is

based on the attached Memorandum of Points and Authorities and

exhibits, the files and records in this case, and any further

//
//
//
//

evidence and argument as may be presented at the sentencing hearing.

Dated: July 13, 2015                    Respectfully submitted,

                                        EILEEN M. DECKER
                                        United States Attorney

                                        ROBERT E. DUGDALE
                                        Assistant United States Attorney
                                        Chief, Criminal Division


                                         /s/ Ellyn Marcus Lindsay
                                        ELLYN MARCUS LINDSAY
                                        Assistant United States Attorney

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES.................................................ii

I.    INTRODUCTION..................................................1

II.   FACTS........................................................1

III.  DEFENDANT'S GUIDELINES ARGUMENTS.............................2

      A.    LENGTH OF PARTICIPATION................................2

      B.    ROLE IN THE OFFENSE...................................5

IV.   SENTENCING FACTORS...........................................6

      A.    "(1) the nature and circumstances of the offense and
            the history and characteristics of the defendant."........7

      B.    "(2) the need for the sentence imposed...................17

            1.    "(A) to reflect the seriousness of the offense,
                  to promote respect for the law, and to provide
                  just punishment for the offense."...................17

            2.    "(B) to afford adequate deterrence to criminal
                  conduct."...........................................17

            3.    "(C) to protect the public from further crimes of
                  the defendant."....................................17

            4.    "(6) the need to avoid unwarranted sentence
                  disparities among defendants with similar records
                  who have been found guilty of similar conduct.".....18

            5.    "(7) the need to provide restitution to any
                  victims of the offense."...........................19

V.    CONCLUSION..................................................19

# TABLE OF AUTHORITIES

**FEDERAL CASES:** **PAGE**

*United States v. Becerril-Lopez,*
     541 F.3d 881 (9th Cir. 2008) ...............................18

*United States v. Green,*
     592 F.3d 1057 (9th Cir. 2010) ..............................18

**FEDERAL STATUTES:**

18 U.S.C. § 371.........................................................1

18 U.S.C. § 3553(a)................................................6, 19

**SENTENCING GUIDELINES:**

U.S.S.G. §2B1.1.......................................................16

U.S.S.G. §3B1.2.........................................................5

U.S.S.G. §3B1.2(b).....................................................5

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

**I.    INTRODUCTION**

The government concurs with the findings and position of the probation officer as set forth in the presentence report.  The government believes that a low-end sentence of 60 months is appropriate.

**II.   FACTS**

Defendant pled guilty to one count of conspiracy, in violation of Title 18, United States Code, Section 371.  Defendant's conviction is based on her participation in a fraudulent telemarketing operation based in Montreal, Quebec, Canada, that targeted elderly victims in both Canada and the United States.  In the plea agreement, defendant agreed to the following statement of facts:

> Beginning as early as 2004, and continuing through December 2006, several individuals engaged in a conspiracy to commit mail and wire fraud.  Defendant knowingly joined this conspiracy intending to accomplish its objects.  The conspiracy operated as follows: working in a location in Montreal, Quebec, Canada, telemarketers committed fraud against victims in Canada and the United States, including victims located in the Central District of California.  At a date currently contested by the parties, but no later than November 2006, defendant joined this conspiracy as a telemarketer.  Defendant's co-conspirator obtained "leads," that is, names and contact information of potential victims in the United States and Canada.  Working from the leads, defendant and other telemarketers contacted victims by telephone and mail and falsely informed them that they had won a large sum of money in a sweepstakes or lottery.  As defendant then knew, this representation was false and fraudulent, as there was no sweepstakes or lottery, and the victim called had not won any sum of money from defendant or anyone with whom she was associated.

> Defendant and other telemarketers falsely told the victims that, in order to collect their "winnings," the victims had to pay a sum of money, which the telemarketers falsely represented was for taxes, administrative fees, insurance, legal fees, and other expenses that purportedly had to be paid before the "winnings" could be sent to the victims.  As defendant then knew, these representations were false and fraudulent, as there were no winnings to be

sent and the victims had no reason to send money to
defendant or anyone with whom she was associated.

Defendant and other telemakreters instructed the
victims to send the money for the purported expenses and
fees required for release of their winnings in a variety of
ways: (i) By wire transfer via Western Union or MoneyGram,
either in a name of the victim's choosing, or in a name
supplied by the telemarketers; (ii) by mail or by
commercial carrier, such as Federal Express, to an address
supplied by the telemarketers; and (iii) by wire transfer
from the victim's bank account into a bank account
controlled by a co-conspirator.  Defendant would receive a
percentage of the money she obtained from victims she
called.

In furtherance of the conspiracy and to accomplish the
objects of the conspiracy, on November 16, 2006, defendant
had a conversation with co-defendant John Bellini regarding
working with certain other co-defendants.

## III.  DEFENDANT'S GUIDELINES ARGUMENTS

Defendant asserts that the guidelines were improperly calculated
in two areas: 1) loss, in that she only became involved in the crime
in the last month; and 2) that she had a minor role in the offense.
The government hereby responds to these arguments.

### A.  LENGTH OF PARTICIPATION

Defendant asserts, with no declaration, sworn or not, and no
actual evidence, that she only joined the Bellini organization at the
tail end of the fraud.  However, the evidence is to the contrary.
Both Bellini and coconspirator Alexander Andriopoulos place defendant
as a telemarketer even before she joined Bellini.  The evidence is
set forth in the summary and memorandum of interview of Bellini,
attached hereto as Exhibit 1, and in the summary of the statement of
Andriopoulos, attached here as Exhibit 2.

Andriopoulos stated that in 2001, he put together a "small crew"
to do lottery pitch telemarketing ("it was much easier to sell an
American for more money than a Canadian . . . people over sixty five

1  (65) were lonely and they couldn't say no to you"). (Exhibit 2,

2  bates pages ("bp") 708-09.) This crew included defendant. (Exhibit

3  2, bp 709.) They worked out of defendant's home. (Exhibit 2, bp

4  718-19.)

5      Bellini also noted that in 2003, when he was "a burnt out

6  druggie," defendant and others were working for Andriopoulos.

7  (Exhibit 1, bp 548.) Then they asked Bellini if they could come work

8  for him, and they did so, making about 10 deals per month. (Exhibit

9  1, bp 556.) At one point, defendant asked Bellini to use her

10 boyfriend, Danny, as a runner to receive transactions from Western

11 Union and MoneyGram. Bellini allowed Danny to do this work until he

12 found out that Danny was failing to give Bellini the money he picked

13 up. (Exhibit 1, bp 550.) For a while, defendant and Arlene Grundy

14 worked in the grants and loans room,[1] but they were not making enough

15 money, so they went back to the lottery scam. (Exhibit 1, bp 556,

16 565-66.) Bellini did not trust defendant because she "always cheated

17 him." (Exhibit 1, bp 557.) The telemarketers often worked out of

18 defendant's home. (Exhibit 1, bp 557.)

19      Defendant asserts that the separate statements of two

20 cooperating codefendants should be entirely disregarded because these

21 codefendants were just trying to make a deal with the government.

22 However, when each codefendant made his statement, there was no focus

23 on defendant whatsoever -- rather, each codefendant was asked about

---

[1] The "grants and loans" scam is similar to the lottery scam: victims are promised that, for an advance fee, they will receive a loan or government grant. As Bellini stated, "the grants were illegal . . . With the grants they were basically telling [the victims] it wasn't a guarantee they were gonna get the loan but in a scummy way they were. In reality, all [the victims] were getting was an application for the grant, they never got the $7,000 grant." (Exhibit 1, bp 547.)

1   numerous participants in the crime.  If these cooperating

2   codefendants were going to lie about defendant, there is no reason

3   why they would not have also lied about all the other participants.

4   As it is, the only two charged defendants Andriopoulos names as

5   working for him in 2001 are defendant and Arlene Grundy (Exhibit 2,

6   bp 709) -- if he were truly attempting to earn favors from the

7   government by lying, he certainly would have named more of the

8   charged defendants.  The same is true of Bellini -- the only people

9   he named as working for Andriopoulos were Mark Dash, defendant,

10  Grundy, and some others who were not charged.  (Exhibit 1, bp 548.)

11  Moreover, Bellini's statement that defendant and Grundy worked out of

12  defendant's home (Exhibit 1, bp 557) was corroborated by the leads,

13  phones, scripts, and other items found by the RCMP when they searched

14  the premises.  (Defendant's Exhibit, p. 5.)

15      Defendant cites to a summary report regarding defendant prepared

16  by the RCMP.  The report states that defendant came to the attention

17  of the RCMP in 2006 when her name was heard on the intercepted

18  telephone calls.  The report also summarizes intercepted calls in

19  which defendant is one of the speaking parties.  Defendant takes this

20  summary and claims that this is the extent of her involvement in the

21  crime.  (Defendant's position, p. 3.)  This is incorrect: the report

22  is what it claims to be, a summary.  Moreover, it does not state that

23  defendant started her involvement in the crime in 2006, but rather

24  that she came to the attention of the RCMP, which is when they began

25  their investigation.  Meanwhile, only indication by defendant that

26  she only began the offense in the last month is her counsel's

27  unsupported statement.  Without a sworn declaration or anything else

28  to the contrary, this Court should give the assertion no weight.

**B.   ROLE IN THE OFFENSE**

Defendant claims that she should receive a reduction in her offense level pursuant to USSG § 3B1.2(b) because she had a minor, or even minimal, role.  The probation officer declined to apply this reduction for the following reasons:

> Based on the information provided to the Probation Officer, **Muir** served as a telemarketer for the entire time of the scheme.  According to statements from co-defendants, **Muir** joined the conspiracy from the beginning and initially worked for Andriopoulos and later Bellini.  During that time, she used "lead" lists provided by co-defendants to fraudulently solicit funds from victims under the ruse of a lottery.  **Muir's** role was instrumental in accomplishing the goals of the conspiracy and the amount of loss she caused to her victims.  Based on this information, she cannot be considered substantially less culpable than her co-participants and no role reduction is applied.

(PSR ¶ 36.)

The application notes to section 3B1.2 instruct that this reduction should be applied to individuals who are "less culpable than most other participants, but whose role could not be described as minimal." (App. Note 5.)  As an example for a fraud scheme:

> [A] defendant who is accountable under § 1B1.3 for a loss amount under §2B1.1 . . . that greatly exceeds the defendant's personal gain from a fraud offense and who had limited knowledge of the scope of the scheme is not precluded from consideration for an adjustment under this guideline.  For example, a defendant in a health care fraud scheme, whose role in the scheme was limited to serving as a nominee owner and who received little personal gain relative to the loss amount, is not precluded from consideration for an adjustment under this guideline.

(App. Note 3(A).)

Defendant played a key role during her time in the lottery scam -- she was one of the telemarketers who personally lied to victims and took their money.  Moreover, unlike the nominee owner in the application note example, defendant was well aware of the scope of

5

the scheme, as she worked with various different telemarketers, sometimes out of her home. (See Summary Report, pp. 2-5, indicating defendant's clear familiarity with the scam and the fact that she is working out of her own home with Chryssanthopoulos, Mensah, Mosher, Goodheart, Jim Farmer, and Magi.) Moreover, defendant's participation was hardly limited -- she was involved for approximately five years in lottery scam telemarketing before she was arrested. Thus, as the probation officer concluded, a minor role adjustment is not appropriate.

Defendant refers this Court to the 2015 guidelines amendments. However, the changes to the role reduction application notes have little effect on this case. The key question is still whether the defendant "is substantially less culpable than the average participant in the criminal activity." 2015 Application Note 3(C). The average participants in the criminal activity in this case are the telemarketers and the MoneyGram/Western Union owners. They were the cogs in the wheel. A minor or minimal participant would be one of the runners used to pick up the money from Western Union or MoneyGram, or perhaps someone who allowed his or her bank account to be used for a wire transfer in exchange for a cut of the money. But defendant's ongoing activity directly stealing money from the elderly should not qualify her as a minor participant.

**IV. SENTENCING FACTORS**

The government believes that an evaluation of the factors set forth in 18 U.S.C. § 3553(a) demonstrates why a sentence at the low end of the range of 60 months is appropriate.

**A.   "(1) the nature and circumstances of the offense and the history and characteristics of the defendant."**

This case involves an egregious fraud that targeted the elderly and infirm.  As a telemarketer, defendant personally cheated these victims out of money they could hardly afford to lose.  The callousness and disregard of basic human decency make this a very, very serious crime.

Given that this Court has varied below the guidelines in virtually every defendant's case, the government has made an attempt once again to bring the victims of this crime back into the courtroom by seeking victim impact statements.  Although many of the victims are now dead, the government has obtained some statements, redacted copies of which are attached to this pleading as Exhibit 3.  The government requests that, unlike other submissions of the government regarding the seriousness of this crime and the application of guidelines factors, this Court will bother to read them.  The attached statements demonstrate the extreme harm this crime visits on its elderly and otherwise vulnerable victims.  Excerpts of the statements are as follows:

The daughter of victim Marie writes:

> She past away in Nov. 2008, but I can tell you very simply how this case affected my mother, the scam took away her pride, her will to live, and her dignity, as well as her money.  It is my hope, these people are sentence to the full extent of the law for what they did.

The daughter of victim Edith writes:

> Due to these people my mother died in a county home with nothing left to her name.  I am not looking for anything in the way of restitution, just want you to do what you can for the remaining parties still out there that have been taken for their life saving.

7

<u>From victim Marilena</u>:

I am writing as a victim of fraud that happen with me little over 12 years ago when at that time I was pregnant with my No. 8 child.  It was a horoble experience what I have to go true and all the suffering I had to go true. Almost all the money were my children's savings.  My husband work very hard for each and every penny to suport the family.  What this individual put me and my family true its very hard to describe your honor.  So many hardships and nights with out rest.  I am blessed, nothing happen with my pragnancy at the time and my baby.

<u>The daughter of victim Sidney writes</u>:

My father is illiterate, so he has ask me to follow up on the letter he received concerning the Western Union scam.

My late step mother is the one that started sending them money, my father (who was the only one working at that time) was not made aware of this until after she had sent them thousands of dollars.  My step mother pasted away a few years ago and when I went to help him pick out a casket and make arrangements, he told me then that he was broke. He explained why and I was so upset that I had to leave the funeral home.  I was devastated to hear that after working all these years his savings was lost to a man that promised them all this money and in return they got nothing.  My father only had a 4th grade education and worked hard to save up money for his retirement.  How could anyone prey on the elderly?

This scam has cost my father a lot on heartache.  He is 79 years old and doesn't have the money to buy food after he pays his bills.  The money that was set aside for his retirement was used up sending these people money thinking that it would come back to them but needless to say, that money was never received.

At this time, I am pleading that these people be prosecuted to the fullest extent of the law.  My father has nothing at all because of this scam and my poor late stepmother has no grave marker and her funeral expenses are being paid in small monthly payments.

These people have taken away from him the life that he expected to have after retirement.  I have had to step in and help with mortgage payments, food, utilities and medication.

This is totally unfair and these people deserve to be punished.  I hope they suffer like my father is suffering now.

<u>The daughters of victim John write</u>:

We are writing to share with you the tremendous impact this scam had on our late father, John . . . and continues to have on our lives to this day.

This horrible scam had many far reaching victims.  First and foremost it affected our father . . . mentally, physically and emotionally.  But it also affected the rest of his family.  He was so drawn in and believing of all the lies he was told by these people that he went as far as to try to get our mother to sign a check to send them while she was being treated in the emergency room.  We had to have him barred from her room.  At one point, one of his grandsons took him to the SBI so they could talk to him in hopes of convincing him he was involved in a terrible hoax.  He began to question himself and his sanity.  At one point, we ended up having to put him in a mental hospital.  We also had to go to an attorney to become Power of Attorney over all his affairs to stop him from sending any more money to these horrible people.  We had to refinance his home in order to cover the loans he had taken out so that he could send them more money.  We are still paying these loans off to this day and unless we receive some money back from the courts, in all likely hood, our children (his grandchildren) will be burdened with continuing to pay off these loans.

The worst part of all of this was it took away several good years from his life.  It affected his health greatly and caused him to not trust any of us or believe anything we told him.  He became non-trusting of everyone.

This should never have happened.  Our father was a sweet, kind, gentle man who should have been able to live out his final years in peace and comfort.  Instead, his final years were filled with conflict, worry and despair.  He was robbed of a great deal of money.  But not only were we robbed of the money, we were also robbed of being able to spedn his final years with him peacefully.  Instead theyw ere filled with worry and panic over what we were going to do to recover the money he had lost.  We also had to worry about how we were going to be able to afford to take care of him and our mother during their final years.

But sadly, in the end, even if we recover all the money that was stolen from him, we can never bring back our fathers' final years and we can never give him the peace he so rightly deserved.  It was all taken away by these horrible people who never for a moment considered their victims or what they were doing to him.  They were only interested in what they could get as a result of their lying, stealing and destroying other people's lives.

We hope they will be sentenced as harshly as possible to to the full extent of the law.  We also hope they will spend their years as miserable as they have made so many others . . . including our father.  But even this will never be enough to repay all the havoc they have caused so many people. **We hope you will lock them up for the rest of their lives and they will never be free again.**

The daughter of victim Betsy writes:

My mother, Betsy, passed away in September 2007 and I am the personal representative for her estate.

My mother had dementia and Alzheimer's disease.  The impact of being scammed was huge, leaving her thousands of dollars in debt and unable to pay her medical bills, fuel bills, and most of her living expenses.  As a result, I am still paying off her debts.

She received numerous phone calls and letters encouraging her to send money to collect a big payoff.  Because of her mental state, she was unable to recognize that she was being scammed.  I was unaware until a couple of months before her death that she had been giving her money away and not paying her bills.

While I hold little hope of ever recovering any of the money taken from her, I am hopeful that the defendants will receive a fitting punishment and in any case, be prevented from scamming other innocent victims.

Victim Gary writes:

First!! I want to thank you for telling me justice is being done to them and the scammers.  "There good scammers"! Took me for $12,000 Dollars.  I told them is was money from loosen my wife, "she die" and its was for my little girl "They didn't care."

Victim Nancy writes:

It brings happiness to my heart that something has been done in regards to this case.  Almost 10 years ago, my life changed drastically when my ex-husband and I heard we lost an enormous amount of money to an unknown source.  At the time, I couldn't believe what I had heard and the devastation it caused for my family.  As I looked into my children's eyes (they were so little at the time), I could not fathom the fact that they may not have food to eat tomorrow.

This event was very stressful to my family and I.  The pain and suffering it has caused for us, has left us with scars for life.  After receiving this letter, I couldn't help but

10

rejoice with my family about the justice it has brought for the other victims.

The daughter of victim Richard writes:

My dad, Richard [], passed away in 2009, my mother in 2013. My sister and I were devastated at the thought of our dad being scammed.  It made it hard for us to take care of our mom! These people should be sent away for life.  All they do is cause grief for the innocent families.  My dad was always a smart man, until he got "Althimors."  That's when they took advantage of him!

Victim John writes:

    My wife had just been diagnosed with dementia and when I got the call that I had won a good some of money in a lottery I thought it would help a lot with doctor bills and medication.

    Needless to say I was very angry when I got the last call that I didn't get any money.

    I was wanting to make her life as better for her as I possibly could.  I lost in 2006.  We would have been married 53 years if she had lived til December. . . .

Victim Beatrice writes:

    We had just been through a very difficult time.  We were farmers in Monterey County, Ind. and had been all our lives.  We lost 640 acres due to the economy for farmers at that time.

    We moved to Indianapolis thinking it would be a better place for Norman, my husband, and me to find employment.

    I received a call from a man that told me he would give us some money.  We had to come up with so much money _ send it to an address he gave me.  He made me feel like it was stupid not to accept the offer. . . .

    When I think about now, it doesn't make sence!

    I pray you can stop this nonsense.

Victim Joan writes:

    I had names, phone numbers, and citys where I sent money.  But being ashamed that I was so dumb I burnt all of them so my family wouldn't know I was so dumb.

1      The impact it had on me I have struggled finacly ever since.  So I truly hope some of the people get there money back.

2

3      Thank you for getting some of these guys.

4     <u>The sister of victim Danny writes</u>:

5    During this time of this scam, Danny was threatened by phone calls at his home, as well as His place of employment.  The caller would state, "I will kill you and your Family if you don't do as I say, I know where to find you."

8    Danny became frightened and was afraid to go outside, he had anxiety attacks while leaving his home for work.  When he returned home from work each day, he would leave all his drapes pulled closed, he would not open any windows, he would not answer the phones, and had not opened his mail for the past four years or so.  Danny isolated himself to his bedroom and became depressed.  After about 6 months or so, Danny finally had a mild heart attack.

12

13    I had to move Danny into my home, He still has Heart problems and has had two other episodes.  He has to be monitored every day.  He still will not leave the House because he is scared to be around people.  He stresses knowing that my husband and myself put out $5,000 to pay the Bank back and all the expenses which occured because of this.  I also had to quit my job to take care of Danny.  This has impacted several family members.

17    I am glad to see these people were caught and I hope they are punished to the max.  Danny will enver be the same, and I feel our family has been through so much since this incident has happened.

19

20    <u>The son of victim Bernard writes</u>:

21    . . .  One day, I noticed that my father (age 83 at the time) was getting multiple phone calls during the day after which he would say he "had to run an errand" and then he'd leave for about an hour or so and then return. . . .  Anyway, I was standing in the kitchen one morning and the phone rings and . . . I must sound a lot like my Dad on the phone because when I picked it up and said "Hello", some guy on the other end starts in on me with "Doc, I haven't received that wire yet for the transfer fee and until I do I can't send you your money.  I need you to send that $1,500 as soon as possible so I can send your money.  Can you send that money in today . . . ?

27

28    Needless to say, as soon as I asked "who is this?" - he hung up.  As I was hanging up the phone, the phone cord

brushed a rolled up set of papers off of the desk that my father had in one corner of the kitchen and they spilled all over the kitchen floor. . . .  I added all of them up and it totaled almost $48,000 in wire transfers that my Dad had sent to an address in Canada. . . .  Obviously, my father had been taken.

. . .

Subsequent to all of this, I found out that my Dad had been paying for these wire transfers by cashing stock in his retirement account, taking cash advances on his credit card, writing personal checks, etc.

The worst part of this story is that it made me realize that my father had developed the early stages of dementia/alzheimer's. . . .

In summary, I hope these guys burn in hell for what they did to my Dad.  They feasted on him like a pack of hyenas, knowing that they had an elderly person on the other end of the line and they didn't give a damn what their actions did to him -- and my Mom. . . .

Finally, I would ask the judge to consider how he/she would feel if the same thing happened to their Dad - and then sentence them accordingly.

Victim Helga writes:

. . . I was a victim of a SCAM, shortly after emigrating legally to the United States of America in 1999. . . .  The immigration process taught me that dedication in pursuing what one believes in, is the only way to conquer adversity and succeed.

My husband was attacked by a gang of criminals at an ATM at a bank in Pretoria, South Africa in 1993.  Having suffered a massive brain hemorrhage due to a blow to the head in the attack, and paralyzed on the left side, he then became dependent on me for all aspects of daily living.  As a professor he had planned to write more books after retiring early as Dean of Faculty of Arts at . . . University of South Africa.  His brain injury prevented any useful academic work of this Oxford scholar. . . .  I became his fulltime caregiver in addition to being a Registered [Dietician] in South Africa.

I mention this that you may understand why I trusted everybody in America, and sadly became a victim of some SCAMS as getting our money out of South Africa was difficult.  We were debt free, lived very carefully and had planned to travel after having worked very hard our whole life. . . .

13

As no position for a RD was available . . . I took any job which was available, from clerical work in Fallon Travel, selling pharmaceuticals, planning a commercial kitchen and being Food Manager and doing catering at Lattin Farms and giving talks on Nutrition for Adult Education as well as private daycare caregiving in my home.

. . . Due to the deteriorating health of my husband I had to leave Banner Churchill Community Hospital in 2009 to take 24/7 care of him until his death in 2011.

I had received a letter in the mail stating that I had won a lottery and I was gullible and naïve and believed that in America, only good things can happen to us.  I spent several thousand dollars to be able to get this money.  I cannot recall the exact amount as everything was very overwhelming to start a new life, leaving our birth country and all we had worked for all our life behind at a great financial loss.  My husband was not able to make any decisions due to the brain injury and I had the responsibility to make us survive.

That is why I fell into this SCAM trap.

. . .

Thank you so much for contacting me, as you can see that my circumstances are not easy.  I am now 78 years old and I am dependent on a widow's pension from SA which varies due to the exchange rate of the dollar and the South African Rand.  It is only worth about 10 cents in the Dollar, so varies between $900 and $1,090 per month.  I receive $310 Social Security per month and have earned Medicare.  I do a parttime job on my computer from home and try to do some Nutrition Consulting for some income.

I would be very thankful if justice could be done to all the victims of this horrible fraud on innocent, honest, people.

Janet writes that an elderly neighbor, victim Davy-Jo, who had no close family or friends to assist her, informed Janet that $60,000 was missing from her bank account.  It transpired that Davy-Jo had named Janet her DPOA and Trustee.  Janet learned that Davy-Jo had been defrauded out of thousands of dollars in addition to the $60,000 through many different scams.  Davy-Jo was clearly suffering from dementia, as she could recall none of this.  Janet continues:

14

For a woman, living with dementia, not even 77 years old, the loss of the almost $100,000.00 was devastating. These defendants being sentenced now could easily tell she was not capable of making financial decisions, and not only took advantage of that fact, but sold her name and telephone number to others.  At one point after a long and contentious telephone conversation with a reader service call employee, he said "Lady, I'm just trying to make a buck.  If she doesn't have anybody looking after her, it's not our fault.  There are a hundred guys just like me sitting in this huge warehouse, and we trade names and numbers like cigarettes."  I was horrified at how many other people just like [Davy-Jo] were likely being duped as well.

[Davy-Jo] died May 11 of this year.  The only good thing is that her disease kept her from remembering how terribly she had been treated and how devastating a loss she had suffered. . . .  These criminals have no morals, they have no compassion or scruples, and my prayer daily is that they will receive adequate punishment to discourage others who take advantage of elderly, ill and vulnerable adults. . . .  I don't believe there is any punishment too severe for such callous and unfeeling scammers.

. . .

I only ask that you consider the negative impact these defendants have had on their victims and impose penalties commensurate with their crimes.

In a declaration filed in connection with the sentencing of John Bellini, Special Agent Nora Collas of the FBI related speaking with the son of a victim with the initials B.B., who was born in 1926. Her son found out that she was being repeatedly victimized by scam telemarketers when her bank called him and told him she was trying to cash her certificate of deposit, after withdrawing large amounts of money by writing checks to cash.  B.B.'s son learned from his mother that she had been told she had won a lottery and that she sent the money to obtain her winnings.  She never did receive what she had been promised.  B.B. passed away from heart failure and B.B.'s son opines that her realization that she had been scammed contributed to her death.

This Court has continuously varied downward for the defendants who caused this harm to their victims.  In fact, the conduct is listed as being in the category of consideration for an upward departure.  Note 20(A)(ii) to guidelines section 2B1.1 provides, as an example of a case "in which the offense level determined under this guideline substantially understates the seriousness of the offense" and therefore "an upward departure may be warranted":

> The offense caused or risked substantial non-monetary harm. For example, the offense caused physical harm, psychological harm, or severe emotional trauma . . . .

The government is not asking this Court to depart or vary upward from the applicable guidelines range.  Rather, the government is reacting to the statements of the probation officer in paragraph 103, apparently feeling very sorry for defendant without considering the extreme emotion, physical, and financial pain defendant personally caused to countless mostly elderly victims from whom she heartlessly stole money.  The government does not understand why this Court should consider defendant's "several physical and emotional challenges, including her mental health (including depression and anxiety and a suicide attempt) . . . and her physical health (including high blood pressure, and speech delay and vision problems as a result of a stroke in 2013)" without considering that defendant herself caused numerous innocent victims to suffer physical and emotional consequences, including contributing to the early death of some victims, according to their loved ones.  Somebody in this equation has to care about the victims of the crime, and that someone is the undersigned prosecutor.

All of this being said, the government does believe that defendant and co-defendant Grundy are on the lesser side of

16

1  culpability, compared to egregious offenders such as Van Wade

2  Bedford, Kevin Power, John Power, Jeffrey Jacobson, Kenneth Goucher,

3  and Jeremiah Mosher, not to mention John Bellini.

4      **B.    "(2) the need for the sentence imposed**

5          1.   "(A) to reflect the seriousness of the offense, to
            promote respect for the law, and to provide just
6            punishment for the offense."

7      The government believes that a sentence of 60 months is

8  necessary to reflect the seriousness of this offense, as well as to

9  promote respect for the law.  The government believes a longer

10 sentence is not necessary to provide just punishment for the offense,

11 given the age of the conduct.

12         2.   "(B) to afford adequate deterrence to criminal
            conduct."
13

14     The government believes that 60 months incarceration will deter

15 defendant from ever engaging in this type of conduct again, and also

   provides general deterrence to others.
16
           3.   "(C) to protect the public from further crimes of the
17            defendant."

18     The government believes that, given defendant's crime, balanced

19 against the passage of time, defendant poses some danger to the

20 public, as she is well versed in the ways of the scammer.  As a

21 further consideration, unlike in the "mine run" of cases, defendant

22 will not be on supervision following her release from custody, as she

23 will be deported.  Thus, she will be under no conditions designed to

24 protect the public, and there will be no way to monitor her

25 activities.  The probation officer apparently believes, with no

26 reasoning whatsoever, that "the likelihood or recidivism and the risk

27 to the community appear to be very low in this case" (PSR ¶ 103), and

28 one can only hope she is correct, given that defendant committed this

17

egregious fraud for over five years, only stopping when she was
arrested, and that there will be no supervision of her conduct once
she is released from custody.

Defendant urges this Court to consider defendant's deportation
as a mitigating factor.  However, defendant is not American, she is
Canadian, and thus her inability to enter the United States in the
future does not appear to pose her any inconvenience.  Rather,
defendant will be returned to where she wants to go, and the minute
she sets foot there, will be under no supervision whatsoever.

    4.   <u>"(6) the need to avoid unwarranted sentence
disparities among defendants with similar records who
have been found guilty of similar conduct."</u>

Following a guidelines sentence avoids disparity between
similarly situated defendants.  United States v. Green, 592 F.3d
1057, 1072 (9th Cir. 2010) (sentencing guidelines exist to create
national uniformity of sentencing); quoting United States v.
Becerril-Lopez, 541 F.3d 881, 895 (9th Cir. 2008) ("[W]e have trouble
imagining why a sentence within the Guidelines range would create a
disparity, since it represents the sentence that most similarly
situated defendants are likely to receive").

The government understands that this Court has varied downward
for three highly contemptible and similarly placed defendants -- one
of whom laughed at the senility of his victims and encouraged elderly
victims to take out loans to send him more money, two of whom worked
for other of John Bellini's fraudulent ventures prior to working the
lottery scam, and one of whom had a vast, multimillion dollar
fraudulent Western Union operation that aided countless crooks in the
Montreal area.  No doubt this Court will take no more seriously the
conduct of this defendant.

5.   "(7) the need to provide restitution to any victims of the offense."

Given that defendant will be deported when released from custody, the government doubts that she will ever voluntarily pay restitution.

As demonstrated by the discussion above, the factors pursuant to 18 U.S.C. § 3553(a) demonstrate that a low-end sentence of 60 months is appropriate.

**V.   CONCLUSION**

For the foregoing reasons, the government asks this court to sentence defendant to a term of incarceration of 60 months, based on an offense level of 27, a criminal history score of I, and a guidelines range of 60 months.